May it please the court, I'm Suzanne Lee Elliott and I represent Mr. Mark Spangler. I'm going to watch my clock here and reserve a few minutes for rebuttal. Mr. Spangler was charged with the intent to defraud a number of investors here in Seattle. His defense was that he did not engage in any scheme or artifice to defraud anyone, that he had a long history of providing investment services in a limited liability corporation and partnerships in the Seattle area. He provided full disclosure to these wealthy, well-educated investors and the fact that they did not read the documents they signed. Well, are you referring to the 1998 agreement or the 2008 agreement because there's a significant difference, is there not, between the two? Yes, and two-thirds of them voted to change the investment values of, or investment ambitions of the private partnerships that they were involved with. If you read all of the 17 or so investors' testimony, they generally testified to a person that they didn't read the documents. Well, now that's not, that isn't responsive to my question. First of all, I didn't read anything in your brief about the fact that the investors voted to approve investments in these two private companies. Is that what you're telling me? Yes, Mr. Gonzalez testified to that, as did others, that they had received it. There was no indication that they hadn't all approved the change. Counsel, are you affirmatively representing that the record shows that two-thirds of these investors voted in favor of putting the majority of their funds into these two startup companies? Is that what you're telling me? Yes or no? They did not, no. No, the record does not show that, does it? It showed that they changed, that the investment partnerships changed and they all agreed to reinvest in the new partnerships, yes. Give me the record site for that. Okay, I'll find it before the reply. Okay, so your position now is that contrary to the theory at trial of the government that the bulk of these were going to go into publicly traded companies, that these sophisticated investors affirmatively agreed that the money could be diverted to startup high-risk investments. In the first document, they named- Yes or no, is that what it says? It says Mark has complete discretion in all of the documents. In the first documents, he named a particular investment company, Southeastern Partnership or something. That changed over time, and that was in the documents. It changed to Hutchinson Investments. It changed to a different investment company. He then, in his document, states, I have complete discretion. This is going to be an illiquid partnership. I am going to invest in nontraditional investments. What the investors testified to was he never told us that he was going to, as the market changed, take this money that we had previously invested in other investment vehicles, some of which were high-risk, and put the bulk of it into Tamarack and Terre Haute. Counsel, that might get you halfway there. As I understand the record, under the 1998 agreement until it was changed in 2008, some $23 million out of the $46 million was invested in these two startup companies. As I understood the record, he did not have the authority to make that determination. It was Southeast Management Assets or their successors who were designated under the 1998 agreement to make that decision. Isn't that true? That is who he named, but that is not true. The document said he had complete discretion to decide where the funds would be. Then what do we need Southeast Asset Management Company for? Just somebody to get commissions out of the sales? I believe it. They provided no services whatsoever to the investors? I assume that they provided some services to the investors, but he determined, the defense was that he determined that as the markets changed. I'm not saying he didn't make a mistake with the markets in 2008. Let me ask you a different question. If this was your defense at trial, if it was argued to the jury, can't we assume from the verdict of guilty that they didn't buy your defense, that the record simply doesn't support that theory? Well, I'll tell you there's three. My defenses here are that they should have heard from the expert, Mr. Keller, who would talk about the indicia of fraud and about the document. Did I say Mr. Keller? I believe it's Mr. Keller. The expert who was excluded by the trial judge to talk about fraud. Nobody comes out and says, I'm committing a fraud. You look at the circumstantial evidence on both sides of the argument, and you say, look, here are the circumstances. He's been in business for 25 years. He has full disclosures. All the documents say he has full disclosures. And that was before the jury? This was the defense, yes. But all that information came in with or without the expert? Because as we start out this argument, it almost sounds like we're arguing a sufficiency of the evidence or some kind of mischarging when, in fact, we have a fairly narrow focus from the briefs on the exclusion of the expert and then the collateral consequences. Isn't that right? Yes. So he wanted an expert to say, none of these things. Who examined the actual documents here, he wanted that expert to say, I don't see any of those kinds of indicia of fraud here. All the people's account balances are accounted for. Why do you need an expert to say that? I mean, all the documents are in there, right? Yes, that is correct. And then let me just ask you, so the documents are in there, and what you just told us about the structure of the change, the full discretion, that was argued to the jury and it was testified about by various witnesses, correct? That is correct. What abuse was there on the part of the district judge then to say this expert we don't need? Two reasons. One is the government said the documents were meaningless. Their entire defense was it was what Mr. Spangler said orally to the investors. So the government's argument was the documents have no meaning here. I think that the expert would have testified that that's not true, that the documents did govern the relationship of the parties. Two, the government put on their own expert, the agent, to say that these are the indicia of fraud. But that wasn't Mr. Carlton's testimony. Mr. Carlton, who drafted the 1990 agreement, said that Mr. Spangler couldn't make that decision without a two-thirds vote of the shareholders. Yes, that's true. That's what he said, and Mr. Spangler's evidence is. Assuming that there's evidence in the record to support the jury's determination, the jury credited Mr. Carlton's testimony and rejected Mr. Spangler's. Mr. Carlton said two different things, and he was not exact, he was not, our second issue, of course, is that we didn't have the complete opportunity to impeach him. Mr. Carlton reviewed some of the documents for another accredited investor. He said, A, I trust Mark implicitly, and two, he said, Mark has broad discretion here. Ask him what he's. I mean, we have to be careful which agreements we're talking about. I agree that there's more discretion under the 2008 agreement than the 1998, but then we also have the testimony from Mr. Carlton that he didn't draft that agreement, he reviewed it very briefly, and the district court properly sustained objections asking to interpret what that document meant, saying that the documents and evidence, the jury can read for itself what the words are. Is that an abuse of discretion? I think the cutting him off of the cross-examination was clearly an abuse of discretion. He was not competent to offer opinions as to what the 2008 agreement meant if he had nothing to do with the creation of the document and his testimony was that he read it in a very cursory fashion. Because his email actually impeached his testimony that he read it in a cursory fashion, and that was the point that Mr. Zuloff was trying to make. Was Mr. Carlton confronted with those emails on Mr. Zuloff's cross-examination? They were trying to confront him with them. Zuloff did that. I mean, it's a question of, like, moving on. And there was cross-examination, and at a certain point it was becoming repetitive, and the district court has broad discretion. I'm having trouble. I don't know of cases where when you've been able to make your point and the information's come in, can you point me to a case where we would determine that it was an abuse of discretion to impose a time limit or cut off the cross-examination? The cases have a, you know, obviously it is clearly within the trial court's discretion. And I cannot point you to a case that says you only have 15 minutes left, counsel, and you're done. But in this case, the government had had 12 days to put on their case, and apart from Mr. Spangler, Mr. Carlton had been involved in Mr. Spangler's companies for years. He had carefully drafted documents that he, quite frankly, in my opinion, was disavowing. He said these disclosures are legal boilerplate. You know, they're not. They're contracts that are enforceable under the law. I was surprised by that testimony. Under Washington law, if you sign a contract, you're presumed to have read it and understand it, and it binds the relationships of the parties. Well, let me ask you about the cutoff question to follow up on Judge McEwen's. As I understand it, Mr. Zuloff told the trial judge, I anticipate my cross will take an hour. The cross actually exceeded two hours. At 20 minutes before the end of the two-hour period, the district court warned Mr. Zuloff that he was basically being repetitive and urged him to finish up his cross examination. He gave him another warning at seven minutes, and I think there might have even been another warning before he finally said, you're done. I mean, it's no different than the clock that's in front of you where we give you a fixed amount of time, and then when the yellow light comes on, that's a warning, and when the red light comes on, you're done. How did the district court abuse this discretion in the conduct of the trial here? Because here, Mr. Carlton was the reason that the cross took so long was, in my view, as Mr. Carlton was quibbling with Mr. Zuloff about answers that should have been clear to him. I am certain he'd been prepared for his testimony. He disavowed knowledge. Mr. Zuloff had the right to demonstrate that I think Mr. Carlton had changed his tune between the time he worked with Mr. Spangler and the time he had said, I trust him implicitly, to the time that he got on the stand. I think he also changed his tune about what documents mean when you're investing in private placement ventures and are joining a limited partnership. So all that was in. Go ahead. What didn't come in that might have come in that would have made a difference? I think further examination about his advice to Mr. Trower and the e-mail and further examination of how deeply he was involved in the Spangler partnerships to show that he now had a motive to distance himself. When the FBI came knocking and civil liability loomed for advice he had previously given as a member of some of the Spangler ventures, I think his testimony probably changed and that's totally appropriate impeachment. Do you want to save the remainder of your time? Yes, I do. Good morning, Your Honors, and may it please the Court. I'm Teal Miller on behalf of the United States. This is not a sufficiency of the evidence appeal. I'm happy to clarify aspects of the record if the Court has questions, but I think the sort of overriding factual difference between what the jury found or the evidence the jury heard and what's been suggested today is that Mr. Spangler was a fiduciary to his clients and the 1998 document affirms his fiduciary duty. It says, subject to fiduciary responsibilities. That's at page 439 of the supplemental excerpts of records. So even though he had written documents... Do you have any issue about the fiduciary obligation? I guess the question I have, can you respond directly to Ms. Elliott's assertion that two-thirds of the shareholders voted to approve under the 1998 agreement the diversion or investment of the majority of their $46 million in these two startup companies when they were told that they were going into public equities? I can speculate as to what she means. Well, you've read the transcript, have you not? Is there any testimony to that effect? No. I mean, this came as a total surprise to me, and I thought I'd read the record pretty carefully. You're right, Your Honor, that more than $20 million had been transferred before the 2008 document. I believe what she's saying is that when the clients signed the 2008 document and sent it back to him, that was an affirmative vote to change the investment strategy. So it's somehow retroactively approved back to 1998? Well, of course, we don't... All of the investment decisions that had been made? That's a question better posed to opposing counsel. Of course, we don't think it did, and his clients testified that they didn't think it did. And indeed, his clients testified that to the extent they didn't review the documents particularly carefully, it was because what he said to them about what the function of the 2008 memorandum was that it was announcing a name change for the funds and that the funds needed to... the placement memorandum needed to be updated after 10 years. It did not say, and he was a fiduciary to these people, by the way, I'm going to be doing something very different with your money from here forward. It also didn't say, of course... Remind me on the... because we weren't focusing as much on the closing argument in looking at the evidentiary questions, and of course there were some comments in closing argument that are challenged, but was this the... did the defense argue this in the closing that basically there had been a wholesale change by signing up to these documents and as sophisticated investors, they're deemed to know what's in the documents? I don't believe the defense ever suggested that the 2008 memorandum had a retroactive effect. I think they did try to suggest that the 2008 memorandum gave Mr. Spengler unfettered discretion. That was something that the government disagreed with and which witnesses disagreed with, both because the disclosures were inadequate and because of some limitations in the 2008 memorandum as well. Mr. Spengler has suggested that the district court abused his discretion by ruling... that Mr. Keller could not testify. As we've suggested, there are three different reasons why that argument is incorrect. The first is that it's been waived. The second is that the evidence simply wasn't relevant. And the third is that there's no prejudice to Mr. Spengler. I'm going to start by saying why I think it isn't relevant, even though that's kind of counterintuitive, because I think the lack of relevance shows why this argument is speculative. This evidence wasn't relevant because the government's theory of liability was not that Mr. Spengler had two sets of books. It wasn't that his internal documents showed one thing and his external documents that he gave to his clients showed another. Rather, it was that the documents given to the clients accurately reflected which fund the money was in, but didn't disclose to them that that fund itself was in turn invested in these two private companies that Mr. Spengler was intimately involved with. And so the district court was right that it wasn't relevant because it didn't controvert the government's theory. Now, Mr. Spengler had suggested... Could it go to intent, though, in terms of how the books were kept and that under the testimony or the purported testimony of Mr. Keller, basically there wasn't any indication of diverted funds in the way the books were kept. Would that not have some indicia of intent? I don't think it... It shows he didn't intend to cook the books, absolutely, but he wasn't being accused of that. So I don't think it's relevant in that sense. And, of course, Mr. Spengler has suggested on appeal particular ways in which it might have been relevant, but those are all speculative because of the limited nature of the information provided to the district court at the pretrial hearing about what Mr. Keller would testify to. And Mr. Keller's determination not to put on any defendant testimony, not to put on the other three experts he was given permission to put on, or to try and make a proffer about what... or revisit the issue with the district court when the government's case closed. And I take it... This is probably a better question for Ms. Elliott, but I take it that in trying to evaluate the import of Mr. Keller's testimony, we would have to know what documents he looked at and what his opinions were from those documents. Is there any proffer in the record as to what he had examined? I believe he said he had examined the receiver's analysis of the Spengler group and then also several client statements, their statement of position, their monthly or quarterly or annual statement of position, and several PowerPoints provided to clients. I don't believe he specified how many or which ones. But again, the government never alleged that those documents failed to accurately reflect how much the clients had invested in particular funds. It was where the funds themselves were invested. So you're not arguing that Mr. Keller's testimony invaded the province as a jury? There is a little suggestion in what was proffered to the district court that he would say it goes to... It shows that he didn't have an intent to defraud. I believe in their response to our motion in Lemonnier, the defense said, well, that was a mischaracterization of what he would testify to. So I don't think that that was part of the objection or the district court's determination about Mr. Keller's testimony. If the court has no further questions, I'm happy to address the suggestion of prosecutorial misconduct or any other area of concern to the court. I'm interested in this loose issue that you talk about, though we may not have to reach it, but it wasn't loose much narrower than you propose. I just glanced this morning at your additional First Circuit case, but two justices said as long as this is limited to 609A, we agree with the decision of the court. And it's typical to be on review to review denial of motions to admit evidence Your Honor, loose announces a narrower rule. This would be an extension of loose. But I don't think it's all that far a bridge, if I can put it that way. I think loose stands for the proposition that there are times when a defendant has to actually taste the toadstool in order to get review. He has to put on the evidence, make an effort to give a factual context for the review. And I think the LaCroix case from the 11th Circuit and the Monell case which we cited in the 28J letter from the First Circuit both recognize that that principle extends to other circumstances. It doesn't extend to every circumstance in which an expert witness doesn't testify because of course there would be circumstances in which there was nothing more the defendant could have done. But it extends to circumstances like these where there was more the defendant could have done and where what the defendant did when it came the moment to put on his experts, and again he had three other experts, makes it purely speculative that he would have had Mr. Keller testify at all in this case. So we have three levels of speculation. One, that the District Court wouldn't have reconsidered his decision if Mr. Spangler had presented additional material after the close of the government's case about why he thought this was relevant to refuting that case. Two, that Mr. Keller would have testified that Mr. Spangler would have opted to have this one defense expert testify even though he had other experts available to him and didn't have them testify. And three, what Mr. Keller would have said. And Mr. Spangler has made representations or theories about how Mr. Keller's testimony would have been helpful, but if you look at page 16 of the excerpt of records, that's all the defense said at the pretrial hearing before the District Court about what Mr. Keller would have said. And it really shows the lack of relevance. The only thing bothers me somewhat, the way the argument would play out here as a practice, though, because in Luce there was conditional ruling. So if the defendant testified, then certain convictions, prior convictions could come in. And here it was pretty clear it was a definitive ruling on emotion and limine. Evidence excluded. And, you know, as a practical matter, when a lawyer hears that and you have a definitive ruling, you know that sometimes some judges get a little antsy when you keep trying to overrule the limine ruling, which is totally definitive. Say, well, that's been excluded. Well, now I want to re-argue it. Why re-argue it? It was a clear ruling. It wasn't tentative. It wasn't conditional. It was a ruling. And under your theory, I would think you would basically, you know, have this sort of popping up all through the trial. When do I need to re-argue my motion on limine in order to preserve it? So I'm maybe a little perplexed about what would be the principle, you would think, come out of a ruling were we to base it on Luce or an extension of Luce. A couple of different notes on that or responses to that. First, the district court said, this is at 21 of the excerpts of record, this is his ruling. In looking at the materials that were presented to the court, the court sees no value in the testimony. That suggests to me, at least implicitly, that if additional materials had been presented, the court might be willing to reconsider. If you reject that suggestion by me, I recognize that you might. I mean, if I were, you know, if I were the lawyer, I would hear it pretty clear from that ruling. But, you know, okay, keep going. I'm a different lawyer. I would say, hey, he said the materials. If I present more materials, maybe he will. And the judge said, well, what don't you understand about, no. But setting that aside, I think at that point the onus is on the lawyer to say, I'd like to make a proffer of this testimony, which he didn't do. We have a very general paragraph, and then as I said, at page 16, just a couple sentences. The other thing that I think would be a limiting principle if this court is looking for one is there's no suggestion on this record that Mr. Keller was the linchpin of Mr. Spengler's defense. He never said, but this is the one witness I really need, or, but this is the witness who, if I don't put this on, there's no point in me putting on an affirmative defense case. Those sorts of things might well be exceptions to the rule that the court announced if it were to make this extension we're advocating for. And, of course, if this court doesn't want to decide on that basis, there's also the lack of relevance and also the lack of prejudice to Mr. Spengler. And I think all of these loose factors also matter as to the lack of prejudice, because how do you establish, how do you assess prejudice when you're guessing that the district court wouldn't have reconsidered, you're guessing? And there was a hearing at the close of the government's case, not a hearing, I'm sorry, but there was, outside of the jury there were a number of different experts discussed, some witnesses who had been lawyers to Mr. Spengler, that Mr. Spengler successfully convinced the court to get in, and then he didn't put any of that on. This happened right before the government closed or right after the government closed. And he didn't mention this witness. There's nothing in this record that supports the suggestion on appeal that it all came down to Mr. Keller, and without Mr. Keller he couldn't make his defense. Well, I can go along with your prejudice argument much more easily than this court should not even review it. I don't get that. Because if it was prejudicial, you should have a new trial. Well, one of the things, I'll just try one more time, Your Honor. I think I understand your argument. I think we have your argument in mind. Thank you. If the court has no further questions, we ask that the judgment be affirmed. Thank you. As to the difference between the 1998 and the 2008 documents, I have discussed that in my brief, and I've just lost the page, and I have the citation to the record, and there was never any argument. I stand by this. There was never any argument by the government that somehow less than two-thirds of the members of the LLC had voted, had not voted. That's a different question. The question I'm struggling with, and I'm still surprised by your representation, and we're going to check it, is that there was testimony that two-thirds of the investors under the 1998 agreement approved the investments between 1998 and 2008. That's how I understood your representation. If I misunderstood it, now is the time to correct it. Let me tell you how I think you misunderstood it. What the investors said was, what they said at trial was, I thought in perpetuity that my funds were going to remain in Southeastern or something similar, I think. That's what they testified to. But their testimony was unreasonable based upon the documents, which said Mark has full discretion and that you're buying his expertise. Again, I guess it gets back to, okay, you made that pitch to the jury, but they didn't believe it, and the witnesses also testified that they instructed him and that they wanted him to be conservative in his investment decisions. There were some investors who gave him very express instructions as to how the money was to be managed so it could be available to pay college funds and that sort of thing. If the jury credited those statements, I could understand why it would not believe the representation by the defense that Spangler could do whatever he wanted with the money because that would be a breach of the fiduciary obligation to follow the client's instruction. It may be that one problem was that Mr. Spangler should have told them, then get out of my funds if they said that. But that doesn't make the documents they signed irrelevant. That puts every— It doesn't necessarily make it inconsistent. Oh, I think it—well, in my view it does. Under the 1998 agreement. I think you have a much stronger argument under the 2008. I think it does because you're looking here at indicia. On the one hand, the government argued—this is another issue in my brief— essentially that a breach of a fiduciary duty is fraud. They got darn close to that position in this case. We know that's not true. It's one factor. It's one factor over here on the government side. I don't disagree, I think, the way it was argued here. I think asking every investor, well, what do you think were the duties he owed to you, is not a legal standard by which you can determine what a fiduciary is. Nonetheless, so over here you have his fiduciary duty. The district court did instruct the jury on the elements of investment advisor fraud under that count of the indictment. They did. And the existence of a fiduciary duty is inherently at play when that charge is laid. But you can violate a fiduciary duty simply by being negligent. No question about it. You don't have to have intent to defraud to violate a fiduciary duty. But that's why the judge said, look, the instruction tells them everything they have to find, and encompassed in that instruction is nothing that suggests you could find it on something less, such as a state obligation or some sort of inferred intent. What's wrong with the instructions? I'm not challenging the instructions. I understand, but you were challenging that sort of this breach of fiduciary duty seeped into. Yes, and I think my view too much, but it came in. So then the ability to cross-examine Mr. Carlton and bring in the expert, the only expert proposed who had actually, and this is docket 74 is his offer of proof, the only person who actually looked at all the documents in the case was the expert who was excluded. The other two were sort of theoretical. This is what was happening in the market because he said so. There's no proffer as to what he looked at. He said, he said, I looked at the receiver's documents and I looked at the portfolios. The receiver's documents or the receiver's analysis. I looked at the analysis. That's not looking at all the documents, counsel. Well, I guess perhaps not, but he said, I also looked at the portfolio analysis that the minister Spangler. He looked at some of them. Again, if we had a fuller proffer from defense counsel at trial as to what the basis was for Mr. Keller's opinion and what that opinion would be, it would be much easier for us rather than to speculate as to what Keller looked at and what he would have said. In my view, there's no speculation. He would have said he saw no indicia of fraud, which was a defense to the notion that he was engaged in fraud. And it's all those little, I agree the government didn't charge him with anything like diversion of investor funds, but every aspect of that weighs in on Mr. Spangler's side of the defense. The problem with the defense theory is that it overlooks the fact that what is at issue here is a material omission of relevant information which investors would have wanted to know. And had they known that information, they would have acted upon it. That's what I understand the government's theory was as opposed to simple breach of fiduciary duty.  So you have to look at all the other things. In light of the other instructions that he'd been given and the representation in 1998 that it was going into publicly traded equities, which are much safer securities than startup companies. Well, they weren't in 2008, and that was Mr. Spangler's approach. And he wanted Mr. Keller to testify that if I'd remained in Southeastern, you would have lost the same amount of money. I think we have your argument well in mind. Thank you. Thank you for giving me a little extra time here to talk. Thank you. I would ask that the court reverse. Thank you very much. Thank you. I'd like to thank both counsel for your argument and your briefing this morning, and we're adjourned.
judges: McKeown, Tallman, Lefkow